No. 26-11444

# United States Court of Appeals

*for the*

# Eleventh Circuit

JENNIFER PETERSON, MELISSA MARTEN,

*Plaintiffs-Appellees*,

– v. –

COBB COUNTY SCHOOL DISTRICT, CHRIS RAGSDALE, in his individual and official capacity as Superintendent of Cobb County School District, JOHN FLORESTA, individually and in his official capacity, JULIAN COCA, individually and in his official capacity, NAN KIEL, individually and in her official capacity, et al.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
(HONORABLE ELEANOR LOUISE ROSS, U.S. DISTRICT JUDGE)

## OPENING BRIEF OF APPELLANTS

JEFFREY R. DANIEL
PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, Georgia 30309
(678) 690-5750

*Counsel for Defendants-Appellants*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (816155)

# APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Appellate Rule 26.1 and Eleventh Circuit Rule 26.1, Appellants Chris Ragsdale, John Floresta, Julian Coca, Nan Kiel, Daniel Vehar, Zach Alderson, and Amanda Chambers (collectively, the "Individual Defendants"), and the Cobb County School District ("CCSD") list the trial judge(s) and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Alderson, Zach, appellant
2. Chambers, Amanda, appellant
3. Cobb County School District, appellant
4. Coca, Julian, appellant
5. Daniel, Jeffrey R., attorney for appellants
6. Floresta, John, appellant
7. Goodmark Law Firm, law firm for Appellees
8. Goodmark, Craig, attorney for appellees
9. Kiel, Nan, appellant
10. Law Offices of Gerry Weber, LLC, law firm for Appellees

11. Marten, Melissa, appellee

12. Parker Poe Adams & Bernstein LLP, law firm for appellants

13. Peterson, Jennifer, appellee

14. Ragsdale, Chris, appellant

15. Ross, Eleanor L., U.S. District Court Judge

16. Vehar, Daniel, appellant

17. Weber, Gerald, attorney for appellee

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT ON ORAL ARGUMENT

Appellants request oral argument. Given the qualified immunity doctrine's importance to "society as a whole," the U.S. Supreme Court has said that appellate courts should "correc[t] lower courts when they wrongly subject individual officers to liability." *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 n. 3 (2015) (collecting cases). Oral argument will help this Court identify the precise factual allegations and legal theories at issue, determine whether Plaintiffs have plausibly alleged violations of their First Amendment rights by each Defendant, and apply the principles of qualified immunity to Plaintiffs' well-pled factual allegations. *See* Fed. R. App. P. 34(a)(2)(B)-(C).

# TABLE OF CONTENTS

**Page**


APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ C-1

STATEMENT ON ORAL ARGUMENT ........ i

TABLE OF AUTHORITIES ........ v

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF ISSUES ........ 3

INTRODUCTION ........ 5

STATEMENT OF THE CASE ........ 11

- I. Statement of facts ........ 11
  - A. The parties ........ 11
  - B. CCSD's written policy on public-comment sessions ........ 12
  - C. The alleged events at the Board meeting on September 14, 2023 ........ 12
- II. District court proceedings ........ 15
  - A. Defendants' motion to dismiss ........ 16
  - B. Plaintiffs' response brief ........ 16
  - C. Defendants' reply brief ........ 18
  - D. Intervening developments in case law ........ 19
  - E. The District Court's order denying Defendants' motion to dismiss ........ 20
- III. Standards of review ........ 21

SUMMARY OF THE ARGUMENT ........ 23

ARGUMENT AND CITATION OF AUTHORITY ........ 26

- I. The District Court erroneously found that Plaintiffs plausibly alleged a First Amendment violation ........ 26

A. The District Court failed to analyze whether Plaintiffs had sufficiently pled a pattern of selective enforcement ..........27

B. Plaintiffs did not plausibly allege that any Individual Defendant's alleged acts proximately caused a deprivation of their First Amendment rights ............................33

i. Plaintiffs did not plausibly allege a viewpoint-discriminatory motive..................................................35

ii. Plaintiffs also allege no personal participation by Floresta, Coca, Chamber, Kiel, Vehar, and Alderson.........................................................................39

iii. The alleged deprivation was caused by the independent acts of third-party counterprotesters, not any CCSD official ..................................................40

C. The District Court erroneously inferred conspiratorial liability among the Individual Defendants without requiring Plaintiffs to plausibly allege the elements of a § 1983 conspiracy ..........................................................42

II. The District Court erred in denying qualified immunity to the Individual Defendants ..............................................................44

A. The District Court identified no legal authority clearly establishing the unconstitutionality of the Individual Defendants' actions...................................................................48

i. The District Court defined "clearly established law" at a too-high level of generality .............................48

ii. The District Court erroneously found that *Holloman* "obviously" established the unconstitutionality of the Individual Defendants' alleged acts..................................................................52

iii. In relying on *Huggins*, the District Court erroneously defined "clearly established law" based on footnoted dictum from post-dated precedent..................................................................54

B. The District Court improperly shifted the burden of showing a clearly established constitutional violation from Plaintiffs to the Individual Defendants ............................56

C. The District Court wrongly denied qualified immunity *en masse* ..........................................................................58

CONCLUSION ........................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alcocer v. Mills*,
906 F.3d 944 (11th Cir. 2018) ....................47

*Am. Fed. of Labor and Congress of Indus. Orgs. v. City of Miami, Fla.*,
637 F.3d 1178 (11th Cir. 2011) ....................43

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ....................54

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................... 21, 22, 33, 45, 56, 57

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) .................... 5, 16, 18, 19

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) ....................46

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................21

*Brosseau v. Haugen*,
543 U.S. 194 (2004) .................... 47, 54

*Brown v. City of Huntsville, Ala.*,
608 F.3d 724 (11th Cir. 2010) .................... 2, 45, 56

*Cantu v. City of Dothan, Alabama*,
974 F.3d 1217 (11th Cir. 2020) .................... 46, 53

*Coley-Pearson v. Martin*,
156 F.4th 1133 (11th Cir. 2025) .................... 40, 41

*Corbitt v. Vickers*,
929 F.3d 1304 (11th Cir. 2019) ....................46

*D.C. v. Wesby*,
583 U.S. 48 (2018) .................... 44, 48

*Dixon v. Burke Cnty., Ga.*,
303 F.3d 1271 (11th Cir. 2002) ....................41

*Edwards v. Dothan City Schs.*,
82 F.4th 1306 (11th Cir. 2023) ....................................................................43

*Edwards v. Prime, Inc.*,
602 F.3d 1276 (11th Cir. 2010) ....................................................................55

*Frederick v. Douglass Foundation, Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023)......................................................................29

*Gaines v. Wardynski*,
871 F.3d 1203 (11th Cir. 2017) ....................................................... 45, 46, 52, 54

*Gundy v. City of Jacksonville Fla.*,
528 F. Supp. 3d 1257 (M.D. Fla. 2021), *aff'd*, 50 F.4th 60 (11th Cir. 2022).......27

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ........................... 21, 24, 45, 48, 52, 53, 55, 56, 57

*Huggins v. School District of Manatee County*,
151 F.4th 1268 (11th Cir. 2025) ................................. 9, 19, 20, 21, 24, 33, 35, 36,
......................................................................... 37, 38, 47, 48, 54, 55, 56, 58

*Jackson v. Sauls*,
206 F.3d 1156 (11th Cir. 2000) ....................................................................40

*LaMarca v. Turner*,
995 F.2d 1526 (11th Cir. 1993) ....................................................................40

*Lane v. Franks*,
573 U.S. 228 (2014)........................................................................... 50, 51

*Lenz v. Winburn*,
51 F.3d 1540 (11th Cir. 1995) ......................................................................45

*Mama Bears of Forsyth Cnty. v. McCall*,
642 F. Supp. 3d 1338 (N.D. Ga. 2022)............................................................6

*McCullen v. Coakley*,
573 U.S. 464 (2014)...........................................................................................27

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004)........................................................................ 28, 29

*McKusick v. City of Melbourne, Fla.*,
96 F.3d 478 (11th Cir. 1996) ..........................................................................21

*Miller v. Palm Beach Cnty. Sheriff's Off.*,
129 F.4th 1329 (11th Cir. 2025) ....................................................................47

*Moms for Liberty - Brevard Cnty., Fla. v. Brevard Cnty. Pub. Schs.*,
118 F.4th 1324 (11th Cir. 2024) .................................................. 5, 6, 17, 18, 19

*Pearson v. Callahan*,
555 U.S. 223 (2009)..........................................................................................44

*Piazza v. Jefferson Cnty., Ala.*,
923 F.3d 947 (11th Cir. 2019) ........................................................................33

*Pina v. Est. of Dominguez*,
145 S. Ct. 527 (2025).......................................................................................55

*Plumhoff v. Rickard*,
572 U.S. 765 (2014)............................................................................................1

*Reichle v. Howards*,
566 U.S. 658 (2012).......................................................................... 44, 49, 51

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
515 U.S. 819 (1995)..........................................................................................27

*Scott v. Harris*,
550 U.S. 372 (2007)............................................................................................1

*Smith v. LePage*,
834 F.3d 1285 (11th Cir. 2016) .........................................................................1

*Swint v. City of Wadley, Ala.*,
51 F.3d 988 (11th Cir. 1995) ...........................................................................22

*Thomas v. Chicago Park District*,
534 U.S. 316 (2002)................................................................... 27, 28, 29, 31

*Tillis on behalf of Wuenschel v. Brown*,
12 F.4th 1291 (11th Cir. 2021) ..........................................................................2

*United States v. Eggersdorf*,
126 F.3d 1318 (11th Cir. 1997) .......................................................................55

*Vinyard v. Wilson*,
311 F.3d 1340 (11th Cir. 2002) .................................................................. 52-53

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)..........................................................................................53

*White v. Pauly*,
580 U.S. 73 (2017) .................................................. 44, 48

*Wood v. Moss*,
572 U.S. 744 (2014) .................................................. 49, 50, 51

*Wright v. City of St. Petersburg, Fla.*,
833 F.3d 1291 (11th Cir. 2016) .................................................. 27, 31

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .................................................. 47

*Zorn v. Linton*,
146 S. Ct. 926 (2026) .................................................. 46, 53

**Statutes & Other Authorities:**

U.S. Const., Amend I .................................. 1-6, 8-10, 13, 14, 16-20, 23, 24, 26, 27,
.................................................. 29, 31, 33-35, 37, 42, 43, 47-54, 56, 59, 60

28 U.S.C. § 1291 .................................................. 1

28 U.S.C. § 1331 .................................................. 1

42 U.S.C. § 1983 .................................................. 1, 3, 8, 11, 26, 33, 40, 42, 43

Fed. R. Civ. P. 12(b)(6) .................................................. 3, 16, 21, 57, 60

Manchester, Julia, *School Boards Become Ground Zero For Country's Culture Wars*, The Hill .................................................. 5

## STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1331, the district court had original jurisdiction over this action because the complaint asserts only federal claims under 42 U.S.C. § 1983.

Under 28 U.S.C. § 1291, this Court has appellate jurisdiction because this appeal is taken from a district court order denying qualified immunity to the Individual Defendants. *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007). Under the collateral order doctrine, the Individual Defendants have a right to immediate appellate review of a denial of qualified immunity. *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014).

Under the "pendent appellate jurisdiction" doctrine, this Court may consider CCSD's appeal because it turns on an issue that is "inextricably intertwined" with the qualified immunity appeal—*i.e.*, whether Plaintiffs plausibly alleged a First Amendment violation by the Individual Defendants. *See Smith v. LePage*, 834 F.3d 1285, 1291 (11th Cir. 2016). "Matters may be sufficiently intertwined when they implicate the same facts and the same law." *Id.* (cleaned up).

Because Plaintiffs' § 1983 claim against CCSD hinges on whether they have plausibly alleged a First Amendment violation by one or more of the Individual Defendants, CCSD's appeal is inextricably intertwined with the Individual Defendants' appeal. Qualified immunity involves a two-part test, the first of which examines whether the plaintiff's factual allegations show a constitutional violation.

*Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010). If this Court holds that the Plaintiffs have not pled a First Amendment violation by the Individual Defendants, then that holding would also dispose of Plaintiffs' claims against CCSD. *See Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1297 (11th Cir. 2021).

On April 24, 2026, Appellants timely noticed this appeal [Doc. 35], and Appellants timely file this brief in accordance with the Clerk's docketing notice.

## STATEMENT OF ISSUES

1) Under Federal Rule of Civil Procedure 12(b)(6) and § 1983, did the District Court erroneously find that Plaintiffs plausibly alleged a violation of their First Amendment right to be free from viewpoint discrimination, with respect to each Defendant?

   a) Under the First Amendment, did the District Court erroneously fail to analyze Plaintiffs' claims under the framework applicable to selective enforcement claims based on the alleged discriminatory enforcement of a speech policy?

   b) Did the District Court wrongly infer that Plaintiffs have plausibly alleged viewpoint-discriminatory motive by Superintendent Ragsdale and the other Individual Defendants?

   c) Did the District Court fail to analyze whether each Individual Defendant personally participated in the alleged deprivation of Plaintiffs' First Amendment rights?

   d) Did the District Court fail to consider whether Plaintiffs' factual allegations show, as a matter of law, that Plaintiffs' alleged injury was proximately caused by the intervening acts of independent third parties rather than any CCSD official?

e) Did the District Court erroneously infer conspiratorial liability among Defendants, in violation of the intracorporate conspiracy doctrine?

2) Did the District Court err in denying qualified immunity to the Individual Defendants?

a) By relying on broad, generalized principles of First Amendment law and dicta from post-violation case law, did the District Court fail to identify controlling legal authority clearly establishing the unconstitutionality of each Individual Defendant's alleged acts?

b) Did the District Court fail to adhere to this Court's burden-shifting framework when it required the Individual Defendants to show that their alleged acts were constitutional rather than requiring Plaintiffs to identify well-pled factual allegations showing a clearly established constitutional violation by each Individual Defendant?

c) Did the District Court err when it denied qualified immunity to all Individual Defendants in gross, without analyzing whether each Individual Defendant's specific, alleged acts constituted a clearly established violation of Plaintiff's First Amendment rights?

## INTRODUCTION

In recent years, school board meetings have become "ground zero" for the country's various "culture wars."[1] It is no surprise, then, that First Amendment litigation has become increasingly common over disputes arising out of school board meetings, even within this circuit. Yet despite that growing body of case law, Plaintiffs' claims are unique and do not fit neatly within any established paradigm.

To begin, Plaintiffs make no "facial" challenge to CCSD's written policy on public-comment sign-up procedures: Policy BCBI. [Doc. 14 at 1, 4-5.] So for purposes of this litigation, the parties must agree that Plaintiffs challenge a facially neutral, reasonable speech restriction. Out of the gate, that concession distinguishes Plaintiffs' claims from all the cases involving facial challenges to public-comment policies.[2]

Plaintiffs instead claim that CCSD's public-comment sign-up procedures were unconstitutional "as applied" to them. [*Id.*] Though there are many cases that analyze "as applied" challenges to a school board's public-comment procedures,

---

[1] Manchester, Julia, *School boards become ground zero for country's culture wars*, THE HILL, https://thehill.com/homenews/campaign/568428-school-boards-become-ground-zero-for-countrys-culture-wars/ (last visited July 4, 2026).

[2] *See, e.g.*, *Moms for Liberty - Brevard Cnty., Fla. v. Brevard Cnty. Pub. Schs.*, 118 F.4th 1324 (11th Cir. 2024); *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017).

those cases all involve *written* policies.[3] Plaintiffs' case is different because they have made clear that they have no problem with CCSD's written policy. [Doc. 14 at 1 ("Defendants seek to dismiss largely by focusing on a written policy that Plaintiffs do not challenge.").]

Plaintiffs instead contend that CCSD and the Individual Defendants all "collaborated" together to engage in unconstitutional viewpoint discrimination by "manipulating" the *unwritten*, sign-up procedures at the Board meeting on September 14, 2023, to prevent them from expressing their hostile viewpoints during the public-comment session. [Docs. 1 ¶¶ 5-10, 41-42, 50, 54; 14 at 7, 19.] But when peeling back that veneer of conclusory allegations, it is clear that Plaintiffs are asking this Court to recognize a novel theory of liability under the First Amendment, based on a set of facts that is materially distinct from any case law or other legal precedent they or the District Court can identify.

Begin with the allegation of "manipulation." When Plaintiffs accuse Defendants of "manipulating" the sign-up procedures, they are referring to the decision to move the sign-up process from a lobby reception desk inside the Board office building, to a mutually accessible space outdoors. To be clear, Plaintiffs can point to no authority, rooted in Policy BCBI or otherwise, either requiring sign-ups

[3] *See, e.g.*, *Moms for Liberty*, 118 F.4th at 1333; *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1346 (N.D. Ga. 2022).

to occur indoors or prohibiting CCSD from changing the sign-up location. Yet Plaintiffs maintain that the sign-up process had to occur indoors, where they had "lined up," based solely on their subjective expectation that this was where the sign-up process would occur. According to Plaintiffs, during the three-year period preceding that Board meeting, that is where CCSD had "always" held the sign-up process, except of course when it had held the sign-up process elsewhere, such as during the COVID pandemic. [Doc. 1 ¶¶ 22-23.] So based on that expectation, Plaintiffs claim they had secured their spot in line by being one of the first fifteen people to get in line at the lobby desk inside. [*Id.* ¶ 31.]

But when the sign-up tablet was instead delivered outside, other counter-protesters pushed them out of the way and got in line instead. [*Id.* ¶¶ 33-35.] In other words, Plaintiffs' own allegations confirm that independent third parties (not Defendants or any CCSD official) are the ones who kept them from reclaiming their spot "in line," thereby preventing them from being eligible to speak under Policy BCBI. [*Id.*]

Consider next the allegation of "collaboration." Plaintiffs do not contend any particular Individual Defendant physically prevented them from getting in line, ejected them from the Board meeting, or told them to stop talking. So when Plaintiffs accuse Defendants of "collaborating" to suppress their hostile speech, Plaintiffs are referring to their pseudo-conspiratorial theory that Superintendent Chris Ragsdale

gave the order to move the sign-up process outside, and that the other Individual Defendants either carried out or failed to interfere with that command. [*Id.* ¶¶ 4-10, 31.] Plaintiffs, of course, allege no fact suggesting that Ragsdale knew who they were or who was in line, much less what any prospective speaker's anticipated speech was. [*See generally* Doc. 1.] Yet they claim it was unconstitutional for any of the Individual Defendants either to follow, to relay, or apparently even to hear, their boss's alleged directive to move the sign-up process outside. In other words, Plaintiffs want the benefit of an inference of conspiratorial liability, without the burden of actually pleading the elements of a § 1983 conspiracy.

No court has ever recognized a First Amendment violation based on the sort of facts and legal theories alleged here. And the District Court should not have done so below. Rather, to state a First Amendment claim based on the alleged discriminatory enforcement of a speech policy, the plaintiff must allege a *pattern* of selective enforcement. Because Plaintiffs sue over only one incident in which the operation of CCSD's sign-up procedures allegedly resulted in their exclusion from speaking during the public-comment session, they have not plausibly alleged that Defendants enforced those alleged sign-up procedures in a viewpoint-discriminatory way.

Nor have Plaintiffs alleged facts suggesting that Defendants engaged in any other form of viewpoint discrimination. Because Plaintiffs only quibble with *how*

CCSD exercised its discretion over *where* to hold public-comment sign-up process, they cannot show that any Defendants violated or deviated from those procedures. That makes Plaintiffs' case materially distinct from this Court's recent decision in *Huggins v. School District of Manatee County*, 151 F.4th 1268 (11th Cir. 2025), where the school superintendent violated school board policy by having the plaintiff physically removed from a board meeting, despite having no authority to give such a command. In other words, *Huggins* involved a form of alleged viewpoint discrimination that is not at issue here.

More fundamentally, Plaintiffs' entire theory of viewpoint-discriminatory motive is hollow at its core. Plaintiffs claim that CCSD violated their First Amendment rights, based on the alleged actions of the Individual Defendants. And according to Plaintiffs, the Individual Defendants all were following the unconstitutional orders of Ragsdale. The glaring flaw in that theory is that Plaintiffs have pled no facts to suggest that Ragsdale had a viewpoint-discriminatory motive. They do not allege that Ragsdale (like the *Huggins* superintendent) knew who they were, much less what they planned to speak on. Without such knowledge, Ragsdale could not have issued such a directive with unconstitutional intent. And there is no reason for the Individual Defendants to have questioned the constitutional motive behind that alleged directive. In short, Plaintiffs have not plausibly alleged that

CCSD or the Individual Defendants engaged in viewpoint discrimination—at least, not in any form this Court has ever recognized.

It is no surprise, then, that Plaintiffs identify no materially similar, controlling legal precedent that clearly established the unlawfulness of each Individual Defendant's alleged acts. Rather, they and the District Court relied on generalized, abstract principles of First Amendment law: namely, that viewpoint discrimination is bad. But that uncontroversial principle does not suggest that the Individual Defendants did anything wrong here. And it certainly was not specific enough to have placed the unconstitutionality of the Individual Defendants' alleged acts beyond debate. As a result, Plaintiffs cannot overcome the Individual Defendants' qualified immunity.

In holding otherwise, the District Court got it wrong. And this Court should now set the record straight.

## STATEMENT OF THE CASE

### I. Statement of facts.

#### A. The parties.

Plaintiffs Jennifer Peterson and Melissa Marten are both Cobb County residents who regularly speak during the public-comment session at CCSD school board meetings. [Doc. 1 ¶¶ 1-2.] They are members of the Cobb Community Care Coalition ("Coalition"), an organization that opposes various actions by CCSD and its officials. [*Id.* ¶ 28.]

Under 42 U.S.C. § 1983, Plaintiffs sue CCSD and seven CCSD officials in their individual capacities:

1) Chris Ragsdale, the Superintendent of CCSD [*id.* ¶ 4];
2) John Floresta, CCSD's Chief Strategy & Accountability Officer [*id.* ¶ 5];
3) Julian Coca, CCSD's Director of Content and Marketing [*id.* ¶ 6];
4) Amanda Chambers, a Secretary for CCSD's Office of Communications [*id.* ¶ 10];
5) Nan Kiel, a Press Relations Coordinator for CCSD [*id.* ¶ 7];
6) Daniel Vehar, an Assistant Director of Marketing for CCSD [*id.* ¶ 8]; and
7) Zach Alderson, a Communications Specialist for CCSD [*id.* ¶ 9].

### B. CCSD's written policy on public-comment sessions.

CCSD Board of Education Policy BCBI (titled "Public Participation in Board Meetings") provides a thirty-minute public-comment session during Board meetings. [Doc. 1-1 at 1 (§ C.).] During the public-comment session, up to fifteen speakers may speak for up to two minutes. [*Id.* (§ D.1.).] Prospective speakers "must first complete a sign-in sheet which should be available 30 minutes prior to the convening Board meeting." [*Id.* (§ D.2.).] They are generally "scheduled on a first come, first served basis." [*Id.* at 2 (§ E.1.).] CCSD does not deny prospective speakers "the opportunity to address the Board on the basis of their viewpoint." [*Id.* (§ F.2.).] Though Policy BCBI sets forth the sign-up procedures, it says nothing about where the sign-up process must occur. [Doc. 1-1.] Nor does it prohibit CCSD from changing the sign-up location. [*See generally id.*]

### C. The alleged events at the Board meeting on September 14, 2023.

Plaintiffs allege that, since 2020, CCSD has made an iPad available at the lobby reception desk thirty minutes before each Board meeting, to enable people to sign up to speak during the public-comment sessions at Board meetings. [Doc. 1 ¶¶ 22-23.] Plaintiffs acknowledge, however, that there have been occasions, such as "during COVID," when CCSD has held public-comment sign-ups in a different location. [*Id.* ¶ 23.] In any event, people sometimes arrive hours beforehand, hoping to secure their spot in line well before the iPad comes out. [*Id.* ¶ 24.]

On September 14, 2023, Plaintiffs and other Coalition members arrived at Board offices to protest CCSD's actions and speak out during the public-comment session at a Board meeting. [*Id.* ¶¶ 28-29.] They arrived two hours before the Board meeting began and waited at the lobby reception desk. [*Id.* ¶ 31.] Plaintiffs claim that Coalition members "had occupied the first fifteen positions" in the sign-up line, even though the sign-up tablet had not yet been brought out. [*Id.* ¶ 32.]

Plaintiffs allege that Floresta, Chambers, and Coca, at the direction of Superintendent Ragsdale, ordered Vehar and Alderson to deliver the sign-up iPad to a location outside the Board office building. [*Id.* ¶ 33.] Plaintiffs then "scramble[d] outside to the new location." [*Id.*]

Afterward, a "physical altercation ensued" between protesters and counter-protesters, resulting in "Coalition members [being] pushed out of line and replaced by" counter-protesters. [*Id.* ¶¶ 33-34.] When the dust settled, thirteen Coalition members got in line at the sign-up location outside, but Plaintiffs did not. [*Id.* ¶ 35; *see id.* ¶¶ 38-39.] Plaintiffs complain that two pro-CCSD supporters instead signed up and spoke. [*Id.* ¶¶ 38-39.] Plaintiffs allege that CCSD delivered the iPad to a different sign-up location to suppress hostile viewpoints at the Board meeting, in violation of Plaintiffs' First Amendment right to free speech. [*Id.* ¶¶ 43-50.]

Nowhere in their Complaint do Plaintiffs allege that Ragsdale knew who was in line, much less what any prospective speaker planned to speak on. [*See generally*

Doc. 1.] Yet Plaintiffs claim he is the one who gave the order to move the sign-up tablet outside. [*Id.* ¶ 4 ("Ragsdale is responsible for excluding [Plaintiffs] from the public comment portion of the September 2023 meeting and divesting them of their First Amendment rights to speak about matters of public concern in that public forum."); *id.* ¶ 33.]

Plaintiffs appear to base these allegations largely on their interpretation of intra-CCSD Teams messages transcribed in their Complaint. [*Id.* ¶¶ 30, 32, 33, 36.] Ragsdale, of course, was not a party to those Teams messages. [*See generally id.* ¶¶ 30, 32, 33, 36.] Rather, the Teams messages were between Floresta, Chambers, Coca, Kiel, Vehar, and/or Alderson. [*Id.* ¶¶ 30, 32, 33, 36.] Being members of CCSD's Communications Department (or working closely with that department), some of these Individuals commented on Board meeting optics, noting the comparative levels of supporters and protesters. [*Id.*]

Floresta said, "We have them outmanned this afternoon" and "[we'll] see about tonight." [*Id.*] And in a later message, Alderson said that Floresta said to bring the sign-up tablet out at 6:28 p.m. (just 30 minutes before the Board meeting would begin). [*Id.* ¶ 33.] That is the extent of his involvement.

Alderson and Vehar were not even present for most of the exchange. The messages clearly show that they had left the Board office and did not return until shortly before 6:30 (when public-comment sign-ups were to begin). [*Id.* ¶¶ 32-33.] They then brought the sign-up tablet out. [*Id.* ¶ 33.] That is all they did.

Kiel said, “The left side of the room looks a little thin today.” [*Id.* ¶ 30.] And then she said, “Uh oh! There are some signs ready to support Ragsdale,” posting a .gif. [*Id.*] That is the extent of her involvement.

Chambers commented that more than fifteen people were “in line” at the lobby desk inside. [*Id.* ¶ 32.] And after the sign-up tablets had gone out, she commented on how loud and “elevated” the atmosphere was. [*Id.* ¶¶ 33, 36.] And Coca told Alderson and Vehar to see Chambers when they got back to the Board office building. [*Id.* ¶ 32.] That is the extent of her involvement.

Coca said, “I hope that the threat of . . . an anti-rally would bring some folks out.” [*Id.* ¶ 30.] He kiddingly referred to protesters as “bad guys.” [*Id.* ¶ 32.] He explicitly joked about saying, “the line can’t form until 6:30.” [*Id.*] That is the extent of his involvement.

Based on these Teams messages, Plaintiff accuse the Individual Defendants of “collaborat[ing]” together to “manipulate the signup procedures that resulted in Plaintiffs [*sic*] exclusion from the public comment session on September 14, 2023.” [*Id.* ¶¶ 5-10.]

## II. District court proceedings.

On October 31, 2024, Plaintiffs filed this lawsuit. [Doc. 1.]

### A. Defendants' motion to dismiss.

On January 3, 2025, under Rule 12(b)(6), Defendants jointly moved to dismiss this action, arguing that Plaintiffs had pled neither a violation of their First Amendment rights nor a basis for overcoming the Individual Defendants' qualified immunity. [Doc. 8-1 at 5-14 and 19-22.]

### B. Plaintiffs' response brief.

In opposing that motion, Plaintiffs clarified that they do not *facially* challenge Policy BCBI. [Doc. 14 at 1.] Rather, they contend that Defendants "*applied*" Policy BCBI in a constitutionally impermissible manner, "focus[ing] narrowly on location switching of the sign-in location (an issue apart from the written policy)." [*Id.* (emphasis added).] In other words, Plaintiffs clarified that their First Amendment claim alleges that Defendants selectively enforced CCSD's unwritten, public-comment sign-up practices based on the hostile viewpoint of Plaintiffs' anticipated speech. [*Id.*]

According to Plaintiffs, "The two constitutional problems here are straightforward. . . ." [*Id.* at 5.]

First, despite abandoning their facial challenge to CCSD's policies, Plaintiffs argued that, under *Barrett v. Walker County School District*, 872 F.3d 1209, 1226 (11th Cir. 2017), the policy was unconstitutional because it gave Defendants "unbridled discretion." [*Id.* at 5-6.].

Second, despite recognizing that *Moms for Liberty v. Brevard Public Schools*, post-dated the Board meeting at issue [Doc. 14 at 17 n.4], Plaintiffs still argued that the case showed that CCSD's public-comment sign-up procedures were "unreasonable" because they were "enforced in an arbitrary or haphazard way." [*Id.* at 6-7.] Plaintiffs argued that they had "shown an abrupt and unnoticed change in the sign-up process that had been consistently carried out for years," based on "Defendants' own words [*i.e.*, the Teams messages], evidencing motivation to rig the system in favor of CCSD supporters and to thwart critics who had waited in line for hours at the established location so that they could sign up for public comment." [*Id.* at 7.]

So that is how Plaintiffs, as the master of their own Complaint, formulated the alleged First Amendment violations at issue.

In trying to overcome the Individual Defendants' qualified immunity, Plaintiffs conceded that they sued them over how they performed their discretionary functions. [*Id.* at 14 ("Plaintiffs do not contest the discretionary requirement of qualified immunity. . . .").] They instead argued that the Individual Defendants are not entitled to qualified immunity because "[v]iewpoint-driven prior restraints on speech are so clearly unlawful that no reasonable government official could believe otherwise." [*Id.* at 15-16.] Beyond that uncontroversial, broad proposition of First

Amendment law, the most factually similar cases Plaintiffs could identify were *Barrett* and *Moms for Liberty*. [*Id.* at 16-18.]

They again argued that they had "pled facts to establish that Defendants' conduct is viewpoint discrimination created by a policy (***or lack of policy***) that grants unbridled discretion to the Defendants. . . ." [*Id.* at 18 (emphasis added).]

And they argued that they "allege[d] a violation of their First Amendment rights when the Individual Defendants acted in concert to intentionally manipulate the public comment sign-up procedures to keep Plaintiffs from presenting their opposing viewpoints to the Superintendent and the Board." [*Id.* at 19.] And Plaintiffs again reiterated that this theory was based on their interpretation of the Teams messages discussed above. [*Id.* at 19-20.]

**C. Defendants' reply brief.**

On March 3, 2025, Defendants filed their reply brief, arguing that Plaintiffs had not pled a First Amendment violation under either "unbridled discretion" or "selective enforcement" theories. [Doc. 17 at 2-7.]

To begin, an "unbridled discretion" claim is, in substance, a facial challenge to the constitutionality of the speech restriction, and since Plaintiffs had abandoned any facial challenge, they had also abandoned any "unbridled discretion" claim. [*Id.* at 1.] Even still, Plaintiffs had not plausibly alleged that the public-comment sign-

up procedures gave Defendants "unbridled discretion." [*Id.* at 3-6.] So that left only the discriminatory enforcement claim.

And the discriminatory enforcement claim failed because Plaintiffs had not pled any facts showing a pattern of enforcement. [*Id.* at 6-7.] At most, they challenged a one-time decision to move the sign-up process to a mutually accessible outdoor location. [*Id.* at 7.]

Beyond those pleading defects, the Individual Defendants also argued that, if they had violated Plaintiffs' First Amendment rights, the unconstitutionality of their alleged acts was not "clearly established" at the time of the Board meeting. [*Id.* at 7-12.] *Moms for Liberty* could not pierce their qualified immunity, because the case post-dated the alleged violation. [*Id.* at 2 n.1.] *Barrett* was materially distinguishable, given that it involved a facial challenge (which Plaintiffs here abandoned) to a written policy (which Plaintiffs did not challenge). [*Id.* at 12-13.] And beyond that, Plaintiffs could not rely on broad, abstract First Amendment principles to supply the clearly established law. [*Id.* at 9-12.]

**D. Intervening developments in case law.**

On August 5, 2025, six months after Defendants' motion had been fully briefed and nearly two years after the Board meeting in dispute, this Court issued its decision in *Huggins v. School District of Manatee County*, 151 F.4th 1268 (11th Cir. 2025). On September 11, 2025, Plaintiffs filed a "Notice of Supplemental Authority"

briefing the District Court on *Huggins* and how it applied to their claims. [Doc. 20.] Defendants then moved for leave to respond to that filing, asking for an opportunity to brief the District Court on *Huggins*, if the Court were inclined to consider it. [Doc. 21 at 4-5.] The District Court later rejected that request. [Doc. 26 at 1 n.2.]

**E. The District Court's order denying Defendants' motion to dismiss.**

On March 30, 2026, the District Court denied Defendants' motion to dismiss, finding that Plaintiffs had pled a violation of Plaintiffs' First Amendment rights, and rejecting the Individual Defendants' qualified immunity defense. [Doc. 26.]

The District Court correctly rejected Plaintiff's "unbridled discretion" theory, given that Plaintiffs had "expressly and unequivocally disavow[ed] a challenge to Policy BCBI." [Doc. 26 at 10-11 (*citing* Doc. 14 at 1-2, 4-5.] But it accepted Plaintiffs' argument that Defendants altered the sign-up process for a viewpoint-motivated purpose. [*Id.* at 11-12.] According to the District Court, "Plaintiffs plausibly allege[d] that Individual Defendants acted in concert to prevent people expressing a specific viewpoint from speaking at the Board meeting," pointing to the Teams messages between Coca, Floresta, Chambers, Kiel, Vehar, and Alderson. [*Id.* at 18.] The District Court identified no factual allegation suggesting that Ragsdale, who allegedly directed the sign-up device to be moved outside, knew of any prospective speaker's anticipated viewpoint. [*See generally id.*]

As the District Court noted, Plaintiffs "[m]aintain[] that there exists a 'broader, clearly established principle' . . . that "[v]iewpoint-driven prior restraints on speech are so clearly unlawful that no reasonable government official could believe otherwise." [*Id.* at 19.] The District Court agreed, finding that this broadly formed legal proposition put the Individual Defendants on notice that their alleged acts were unconstitutional. [*Id.*] In support of that rationale, the Court relied heavily on *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) and *Huggins*. [*Id.* at 19-21.]

**III. Standards of review.**

This Court reviews *de novo* a district court's denial of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *McKusick v. City of Melbourne, Fla.*, 96 F.3d 478, 482 (11th Cir. 1996). Under Rule 12(b)(6), a complaint is subject to dismissal if it fails "to state a claim upon which relief can be granted." To withstand dismissal, the "complaint must contain sufficient factual matter, accepted as true," to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The complaint's allegations must show "more than the sheer possibility that the defendant has acted unlawfully." *Id.* Though the court must construe all well-pled factual

allegations in the light most favorable to the plaintiff, it may reject mere "legal conclusion[s]." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

This Court also reviews *de novo* a district court's denial of qualified immunity. *Swint v. City of Wadley, Ala*., 51 F.3d 988, 994 (11th Cir. 1995).

## SUMMARY OF THE ARGUMENT

In denying Defendants' Motion to Dismiss, the District Court found both that (1) Plaintiffs had plausibly alleged that all Defendants engaged in viewpoint discrimination, in violation of the First Amendment, (2) the Individual Defendants were not entitled to qualified immunity and therefore must be subjected to the burdens of litigation. This Court should reverse both findings.

To begin, Plaintiffs' First Amendment claims are implausible for four reasons.

First, Plaintiffs have clarified that they challenge the constitutionality of only CCSD's public-comment sign-up procedures "as applied" to them—*i.e.*, that the policy was selectively enforced in a viewpoint-discriminatory manner. But that theory of liability requires Plaintiffs to show a pattern of discriminatory enforcement (not just an isolated incident, as here), and Plaintiffs have pled nothing of the sort.

Second, Plaintiffs have not shown that the Individual Defendants' alleged acts proximately caused a deprivation of their First Amendment rights. They pled no facts suggesting Ragsdale had a viewpoint-driven motive, meaning there was nothing wrong with the other Individual Defendants following their boss's alleged directive. Nor did Plaintiffs plead any facts showing that Floresta, Coca, Chambers, Kiel, Vehar, or Alderson personally participated in the alleged violation. And the deprivation was proximately caused by the intervening acts of independent third parties, not the Individual Defendants or any other CCSD official.

Third, the District Court erroneously inferred conspiratorial liability among the Individual Defendants and CCSD, despite that fact that the alleged conspirators all were performing their official job duties as CCSD employees. Accordingly, the intracorporate conspiracy doctrine precludes any § 1983 conspiracy claim.

Putting aside those issues, Plaintiffs also cannot overcome the Individual Defendants' qualified immunity, because the unconstitutionality of their alleged acts was not clearly established on September 14, 2023, the date of the Board meeting at issue. In finding otherwise, the District Court erred in three glaring ways.

First, the District Court identified no clearly established law. Rather, it defined clearly established law at a too high of a level, relying on broad principles of First Amendment law that were far too generalized and abstract to have given the Individual Defendants fair warning that their alleged acts were unconstitutional. It wrongly found that *Holloman*, a case that bears no similarity to this one, established the unconstitutionality of the Individual Defendants' actions with "obvious" clarity. And it then relied on non-binding dicta from *Huggins*, a case that was not decided until two years after the Board meeting in question.

Second, under this Court's qualified immunity framework, the District Court improperly shifted the burden of identifying a clearly established First Amendment violation from Plaintiffs to the Individual Defendants.

Third, building on those other errors, the District Court denied qualified immunity in gross, wrongly depriving each Individual Defendant of an individualized assessment of whether his/her alleged acts violated Plaintiffs' clearly established rights.

## ARGUMENT AND CITATION OF AUTHORITY

This Court should hold that Plaintiffs have pled no First Amendment claim and enforce the Individual Defendants' qualified immunity.

### I. The District Court erroneously found that Plaintiffs plausibly alleged a First Amendment violation.

Plaintiffs' § 1983 claim against CCSD is premised on the theory that one or more of the Individual Defendants violated Plaintiffs' First Amendment right to be free from viewpoint discrimination. Plaintiffs do not allege that any other CCSD official violated their constitutional rights. [*See generally* Doc. 1.] So unless Plaintiffs have pled a First Amendment violation by the Individual Defendants, they cannot maintain their § 1983 claim against CCSD. As discussed below, Plaintiffs have not plausibly alleged that any Individual Defendant violated their First Amendment rights.

In finding otherwise, the District Court erred in three main ways. First, the District Court failed to analyze Plaintiffs' under the correct legal framework applicable to viewpoint discrimination claims based on the alleged discriminatory enforcement of a facially neutral policy. Second, Plaintiffs failed to allege facts plausibly showing that any Defendant's alleged acts caused the alleged speech deprivation at issue. And third, the District Court erroneously inferred conspiratorial liability among Defendants, in violation of the intracorporate conspiracy doctrine.

### A. The District Court failed to analyze whether Plaintiffs had sufficiently pled a pattern of selective enforcement.

Under the First Amendment, a facially neutral government policy is not unconstitutional simply because it has a disparate impact on "some speakers or messages but not others." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014). Rather, such a policy violates the First Amendment only if it is selectively enforced in a viewpoint-discriminatory way. *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 820 (1995) (defining unconstitutional viewpoint discrimination as a speech restriction "because of the speaker's specific motivating ideology, opinion, or perspective"); *Gundy v. City of Jacksonville Fla.*, 528 F. Supp. 3d 1257, 1265 (M.D. Fla. 2021), *aff'd*, 50 F.4th 60 (11th Cir. 2022) ("Since the policy itself is facially reasonable, Plaintiff's claims hang on whether the policy was: (1) used in a way that discriminated based on a speaker's viewpoint, or (2) enforced arbitrarily.").

Admittedly, this Court's selective enforcement caselaw is sparse, making it difficult to delineate the controlling legal principles in Plaintiffs' First Amendment claim here. But this Court has held that "[a] discriminatory enforcement claim can be brought only if a *pattern* of selective enforcement appears." *Wright v. City of St. Petersburg, Fla.*, 833 F.3d 1291, 1299 (11th Cir. 2016) (emphasis added). In support of that principle, this Court cited the Supreme Court's holding in *Thomas v. Chicago Park District*, 534 U.S. 316, 324-25 (2002) (citing *Thomas*, 534 U.S. at 325). And

*Thomas* makes clear that a pattern of selective enforcement is necessary to establish liability when the plaintiff accuses the defendant of exercising its discretion under a speech policy in a manner that unfairly disadvantages speakers with hostile viewpoints. *Thomas*, 534 U.S. at 324-25.

There, the plaintiffs applied several times for speech permits to hold pro-marijuana rallies in a public park, but the government denied them. *Id.* The plaintiffs claimed that the government waived those permit requirements for favored speakers "while insisting upon them" for disfavored speakers. *Id.* Though the U.S. Supreme Court recognized that waiving permit requirements on that basis would be unconstitutional, it held that the plaintiffs could only challenge that alleged practice "if and when a *pattern* of unlawful favoritism appears. . . ." *Id.* at 325 (emphasis added). Even though the government had waived permitting requirements for other organizations, the plaintiffs had not shown the requisite pattern of selective enforcement. *Id.* at 320, 325.

Other circuits have reached the same conclusion in similar contexts. For instance, in *McGuire v. Reilly*, the plaintiffs challenged a facially neutral state statute that regulated speech and activities within a buffer zone around health care facilities that performed abortions. 386 F.3d 45, 48 (1st Cir. 2004). The plaintiffs, a group of pro-life advocates, claimed that the government selectively enforced those buffer zone requirements as a means of suppressing pro-life speech but not pro-choice

advocates. *Id.* at 61-62. Relying on *Thomas*, the First Circuit rejected that claim, holding that plaintiff could not prove a selective enforcement claim without showing a pattern of unlawful favoritism. *Id.* at 64-65.

Similarly, in *Frederick v. Douglass Foundation, Inc. v. District of Columbia*, the D.C. Circuit faced a similar "as applied" challenge and imposed the same "pattern" requirement. 82 F.4th 1122, 1145 (D.C. Cir. 2023). There, the plaintiffs (two pro-life advocates) were arrested for violating a facially neutral defacement ordinance by writing "Black Pre-Born Lives Matter" in chalk on a sidewalk. *Id.* at 1132. They claimed that police had engaged in unconstitutional viewpoint discrimination by selectively enforcing the ordinance, pointing to evidence that, during the summer of 2020, police and city officials turned a blind eye when Black Lives Matter protesters covered the city's streets, sidewalks, and storefronts with paint and chalk during the George Floyd protests. *Id.* at 1131-35. Relying on *Thomas*, the court held that the plaintiffs had plausibly alleged a selective enforcement claim, given the city's well-documented failure to enforce the ordinance against other, "similarly situated" protesters who had engaged in other forms of speech (*i.e.*, not pro-life speech). *Id.* at 1145-47. The court emphasized that, "to prevail on a First Amendment selective enforcement challenge a plaintiff would need to show a pattern of unlawful favoritism." *Id.* at 1146 (internal quotation marks omitted).

Those selective enforcement principles also provide the relevant legal framework for analyzing Plaintiffs' claims here. Again, Plaintiffs challenge the constitutionality of CCSD's sign-up procedures *only* "as applied" to them. [Doc. 14 at 1.] And the "procedure" at issue is how CCSD exercised its discretion in determining sign-up location at the Board meeting in question. Plaintiffs may have had a subjective expectation that public-comment sign-ups would occur at the lobby desk inside the Board office building—*i.e.*, what they consider "the normal location" and "the normal process." [Doc. 1 ¶¶ 22-23, 31.] But under the existing procedure, Plaintiffs cannot credibly argue that CCSD had no discretion to change the location where sign-ups would occur.

Plaintiffs certainly can find no support for such a position in Policy BCBI itself, given the written policy's silence about where sign-ups occur. [*See generally* Doc. 1-1.] They do not allege that CCSD posted signage designating the interior lobby desk as the permanent sign-up location. [*See generally* Doc. 1.] They implicitly recognize that CCSD followed a different practice before 2020. [*Id.* ¶ 22.] And even since 2020, they admit that, during COVID times (*i.e.*, a period of years), CCSD held sign-ups at a different location. [*Id.* ¶¶ 22-23.] In other words, according to Plaintiffs, during the three-year period before the Board meeting at issue, CCSD "always" held public-comment sign-ups at the interior lobby desk—except when it didn't. [*Id.*]

The point is that, even if one assumed CCSD had a typical practice of holding sign-ups inside, Plaintiffs have pled no facts suggesting CCSD could not move the sign-up process to a mutually accessible outdoor location. For all their accusations that CCSD "manipulated" the sign-up procedures [Doc. 1 ¶¶ 41-42, 50, 54], Plaintiffs allege no fact suggesting CCSD violated or deviated from its public-comment sign-up procedures by changing the sign-up location. CCSD was merely exercising its discretion to adjust the operational details of where public-comment sign-ups occur.

So for Plaintiffs to claim that this change in sign-up location violated the First Amendment, they must show that CCSD selectively exercised that discretion based on speaker viewpoint. And to plausibly support that inference, Plaintiffs had to allege a pattern of selective enforcement, not just an isolated incident where they did not get to speak at one Board meeting. *Thomas*, 534 U.S. at 325; *Wright*, 833 F.3d at 1299.

The District Court overlooked that substantive, legal requirement, ignoring whether Plaintiffs could show a pattern of selective enforcement. [*See generally* Doc. 26.] Like the pro-life plaintiffs in *McGuire*, Plaintiffs point to no facts suggesting a pattern of selective enforcement of CCSD's public-comment procedures. At most, Plaintiffs challenge a one-time decision to move the sign-up process to a mutually accessible location outdoors. Because Plaintiffs have alleged

nothing resembling a pattern of favoritism toward pro-CCSD speakers, they have not plausibly alleged a discriminatory enforcement claim, and the District Court erred in finding otherwise.

The District Court appears to have gone astray by misapprehending the nature of Plaintiffs' theory. Rather than analyzing whether Plaintiffs pled the requirements of a selective enforcement claim, the District Court treated the decision to move the sign-up process outside as if that decision itself were some sort of violation of board policy or other unlawful action. [*See* Doc. 26 at 12 ("Defendants altered the sign-in process for public comment to prevent people with an anti-Ragsdale viewpoint from signing up and, thus, speaking at the September Board Meeting."); *id.* at 18 ("Plaintiffs plausibly allege that Individual Defendants acted in concert to prevent people expressing a specific viewpoint from speaking at the Board meeting.").] At no point did the District Court consider whether CCSD's public-comment procedures gave CCSD officials discretion to adjust operational details, such as sign-up location. [*See generally* Doc. 26.]

By conceptualizing Plaintiffs' claim as one alleging a policy violation, rather than one second-guessing how that policy was enforced, the District erroneously side-stepped the selective enforcement framework. Rather than applying the correct analytical framework, the District Court started from the false premise that Plaintiffs had alleged a deviation from Board policy that resulted in a restriction of Plaintiffs'

right to speak during the public-comment session. From there, the District Court relied on readily distinguishable caselaw, such as *Huggins*, to find that Plaintiffs had pled a viewpoint discrimination claim against all Defendants under the First Amendment. And as discussed below, even under that alternative framework, the District Court applied the wrong legal standard to Plaintiffs' claims.

### B. Plaintiffs did not plausibly allege that any Individual Defendant's alleged acts proximately caused a deprivation of their First Amendment rights.

Plaintiffs' § 1983 claims are invalid because Plaintiffs did not plausibly allege that any of the Individual Defendants personally participated in or otherwise caused a violation of Plaintiffs' First Amendment rights. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. The government official must have either (i) personally participated in the constitutional violation, or (ii) have been a supervisor who, through his own actions or policy of indifference, caused a subordinate's constitutional torts (a "supervisory liability" claim). *Piazza v. Jefferson Cnty., Ala.*, 923 F.3d 947, 957 (11th Cir. 2019). Under either theory, the official can only violate the Constitution through "his or her own misconduct." *Iqbal*, 556 U.S. at 677. Liability does not attach just because the government official knows that one of his colleagues has an unconstitutional, discriminatory purpose. *Id.*

(rejecting theory that "supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.").

Here, Plaintiffs allege, under oath, (i) that Ragsdale is the person who ordered the public-comment sign-up process to be moved outside, (ii) that Floresta, Chambers, and Coca, following that order, told Vehar and Alderson to bring the sign-up tablet outside, and (iii) that Vehar and Alderson then did so. [Doc. 1 ¶ 33.] They say *nothing* about what Kiel supposedly did during this process. [*See generally id.*] In any event, once the sign-up device was brought outside, other counter-protesters (not any CCSD official) elbowed their way into the newly formed sign-up line, taking Plaintiffs' spots. [*Id.* ¶ 34.] Based on those allegations, Plaintiffs contend that all Individual Defendants "collaborated" together to violate Plaintiffs' First Amendment rights. [*Id.* ¶¶ 5-10.]

For three reasons, those allegations do not plausibly suggest that each Individual Defendant, through his or her own misconduct, violated Plaintiffs' First Amendment rights. First, Plaintiffs have pled no facts suggesting that Ragsdale had a viewpoint-discriminatory motive, meaning Plaintiffs' entire theory of unlawful motive is hollow at its core. Second, Plaintiffs have not pled facts showing that each of the other Individual Defendants personally participated in a constitutional violation. And third, based on Plaintiffs' own factual allegations, the deprivation was caused not by the Individual Defendants' actions but by the intervening acts of independent third parties.

**i. Plaintiffs did not plausibly allege a viewpoint-discriminatory motive.**

By alleging that the Individual Defendants, by moving the sign-up process outside, were all carrying out Ragsdale's unconstitutional order [Doc. 1 ¶ 33], Plaintiffs have pinned all their hope on one question: have Plaintiffs plausibly alleged that Ragsdale had a viewpoint-driven motive? The answer is no.

In *Huggins*, this Court made clear that, to bring a viewpoint discrimination claim against a government official, the plaintiff must allege facts plausibly showing that the official had a viewpoint-driven motive. 151 F.4th at 1279. There, the plaintiff claimed that a school district's superintendent, the district's chief of security, and a city police officer all violated the plaintiff's First Amendment right to be free from viewpoint discrimination when the superintendent ordered the other two defendants to physically remove the plaintiff from a board meeting. *Id.* at 1276-77.

This Court inferred that the superintendent did so because of the plaintiff's "specific motivating ideology or . . . opinion or perspective," based on allegations that superintendent: (i) knew of the plaintiff's specific hostile viewpoint toward the district; (ii) ignored the established, written procedures, which empowered the board chair, but *not* the superintendent, to remove unruly attendees; and (iii) subsequently apologized to the rest of the board for the incident. *Id.* at 1280. On top of that, the board's vice chair separately apologized to the plaintiff "for his removal and said, 'that will not happen to you or anybody else again.'" *Id.* In other words, there were

many factual allegations, including admissions against interest, showing that the superintendent had an unlawful motive. *Id.* at 1281 ("Along with Sander's knowledge of Huggins's viewpoint, these allegations support the reasonable inference that Saunders removed Huggins because of his" hostile viewpoint.). Based on that set of factual allegations, this Court held that the plaintiff had plausibly alleged intentional, viewpoint discrimination by the superintendent. *Id.*

But this Court reached the opposite conclusion for the chief of security and police officer. *Id.* at 1283. Though the plaintiff alleged that they "intended to restrict his speech or retaliate against him," he pled no facts supporting such an inference. *Id.* They did not even knew of his prior speech against the district. *Id.* At most, the plaintiff had alleged that the chief of security, at the superintendent's direction, instructed the local police officer to remove the plaintiff. *Id.* at 1284 n.12. And the police officer, who was providing security at the board meeting, was simply following the directive of the security chief. *Id.* This Court therefore refused to impute the superintendent's alleged "motive to people who carried out her instructions with no apparent knowledge of her allegedly unconstitutional reason for giving them." *Id.* at 1284.

At first blush, *Huggins* might bear some similarity to Plaintiffs' theory of discriminatory motive here. After all, *Huggins* involved a school superintendent who allegedly directed other government officials to take actions that prevented a citizen

from speaking at a board meeting. But when juxtaposed against Plaintiffs' claims here, *Huggins* actually underscores the insufficiency of Plaintiffs' factual allegations.

Begin with what Ragsdale knew. Though Plaintiffs allege that he was the mastermind behind a scheme to violate their First Amendment rights, their complaint has no allegations suggesting he had a viewpoint-driven motive. Plaintiffs do not allege that Ragsdale knew who they were, much less that they planned to speak out against CCSD at the Board meeting. [*See generally* Doc. 1.] Nor do they allege that Ragsdale was monitoring the situation in the building lobby or keeping tabs on who was "in line." [*See generally* Doc. 1.]

At most, Plaintiffs (and the District Court) relied on Teams messages between communications department officials who were commenting on the comparative levels of supporters and protesters in the lobby. [Docs. 14 at 20; 26 at 18.] But Ragsdale was not a party to those text messages. [*See generally* Doc. 1 ¶¶ 30, 32-33, 36.] And none of those text messages reference Ragsdale, reference any directive by him, or say anything to suggest that Ragsdale was involved in low-level operational details, such as where public-comment sign-ups. [*See generally id.*]

Consider next what Ragsdale allegedly did. According to Plaintiffs, he directed the Individual Defendants to move the sign-up process outside. [Doc. 1 ¶ 33.] As discussed above, if Ragsdale gave that directive, he was well within his

authority of office. Contrast that with the *Huggins* superintendent, who ordered other government officials to physically remove the plaintiff from the board meeting, despite having no authority to do so, regardless of motive. *Huggins*, 151 F.4th at 1281. And in *Huggins*, both the superintendent and the board later admitted that the superintendent should not have done so. *Id.*

Those distinctions make a world of difference. In *Huggins*, the plaintiff pled a plausible claim of viewpoint discrimination, based on the superintendent's knowledge of their hostile speech, coupled with his *ultra vires* acts. Quite simply, the *Huggins* superintendent went rogue.

The same cannot be said of Ragsdale, even under the deferential pleading standard. Plaintiff merely allege that he ordered the sign-up process to be moved outside. [Doc. 1 ¶ 33.] But without more, Plaintiffs have given this Court no basis to infer he had a viewpoint-driven motive. In other words, the allegations against Ragsdale hew much closer to the *Huggins* plaintiff's allegations against the chief of security and police officer.

Here's the upshot: if this Court looks to *Huggins* for guidance, it should hold that Plaintiffs have not plausibly alleged viewpoint discrimination by Ragsdale. And if Plaintiffs have not plausibly alleged that Ragsdale had a viewpoint-driven motive, then they have also pled no basis for imputing that non-existent motive to either the other Individual Defendants or CCSD. *See Huggins*, 151 F.4th at 1284 (refusing to

impute superintendent's unconstitutional motive to subordinates who had no reason to question the constitutionality of that motive). For those reasons, Plaintiffs have pled no basis to infer that Defendants had a viewpoint-driven motive.

#### ii. Plaintiffs also allege no personal participation by Floresta, Coca, Chamber, Kiel, Vehar, and Alderson.

Plaintiffs also have pled no basis to suggest that Kiel, Floresta, Coca, Chambers, Vehar, or Alderson personally participated in the alleged deprivation.

Of all these individuals, Kiel is the easiest call. Plaintiffs say nothing about what she supposedly did wrong. At most, she was a party to some text messages in which she shared a .gif. [Doc. 1 ¶ 30.] Plaintiffs do not even allege that she followed or relayed Ragsdale's alleged directive to move the sign-up process outside. [*See generally id.* ¶ 33.] It is as if Plaintiffs named her as a defendant and forgot they had done so.

As for Floresta, Coca, and Chambers, Plaintiffs merely allege that they were guilty of effectuating Ragsdale's directive to move the sign-up process outside. [*Id.* ¶ 33.] At most, they followed their boss's instructions by telling Vehar and Alderson to take the sign-up tablet outside. [*Id.*]

And the claims against Vehar and Alderson are even more tenuous. According to Plaintiffs, Vehar and Alderson committed the sin of following the directions of their bosses, who were simply following the directions of their boss. [*Id.*] They

brought the sign-up tablet outside, but they did nothing to prevent Plaintiffs from getting in line to sign up.

Instead, as discussed below, the people who actually prevented Plaintiffs from signing up were not even agents of CCSD.

**iii. The alleged deprivation was caused by the independent acts of third-party counterprotesters, not any CCSD official.**

Plaintiffs' theory of liability is also infirm for another reason: lack of proximate causation. To trigger liability under § 1983, there must be "an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993). The government official's acts must have been a proximate cause of the constitutional deprivation. *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). Under that standard, the plaintiff's injury must have been the "natural" consequence and "reasonably foreseeable consequences of the tortious acts or omissions in issue." *Id.* It is not enough for the official's acts or omissions to have been "merely a contributing factor." *LaMarca*, 995 F.2d at 1538.

And as with any common-law theory of tort causation, "An independent intervening cause can cut off a causal relationship." *Coley-Pearson v. Martin*, 156 F.4th 1133, 1141 (11th Cir. 2025). "Relevant here," this Court has explained that "a causal relation does not exist when the continuum between the defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous

decision-makers." *Id.* And if the independent actions of non-governmental third parties are what caused the plaintiff's injury, then the injury was not *proximately* caused by the actions of a government official. *Dixon v. Burke Cnty., Ga.*, 303 F.3d 1271, 1275 (11th Cir. 2002). "[S]o long as there is nothing impugning or otherwise undermining the independence of the intervening actor, the plaintiff cannot say that the defendant—through the intervening actor—caused the plaintiff's injuries." *Coley-Pearson*, 156 F.4th at 1143 (cleaned up).

From a tort causation standpoint, Plaintiffs have essentially pled themselves out of a claim against Defendants. According to Plaintiffs, after the sign-up device was delivered outside, Plaintiffs tried to get in line, but two other counter-protesters—neither of whom was a CCSD official—pushed them out of line and took their place. [Doc. 1 ¶¶ 33-35.] The actions of those counter-protesters, not Defendants, are what prevented Plaintiffs from signing up to speak. [*Id.*]

And Plaintiffs have alleged no facts suggesting that Defendants proximately caused that outcome. Just last year, this Court summarized the sorts of situations in which an intervening third-party's actions might not sever the causal chain. *Id.* Most relevant here, they include when the government official (i) "coerces or exercises extraordinary influence over the actor," (ii) "deceives or unduly pressures" the third-party "to take the complained-of action," (iii) "actively and personally participates" in the third-party's injurious actions, or (iv) commands the third-party to commit the action. *Id.* Plaintiffs have alleged no facts supporting such an inference here.

Defendants did not induce the counter-protesters to shove anybody, take anybody's spot in line, or otherwise behave inconsistently with the typical expectations of grown-ups in public places. So from a proximate cause standpoint, there is no basis to hold Defendants liable for the actions of those independent, non-governmental actors.

By failing to properly analyze each Defendant's alleged actions, the Court failed to conduct any sort of meaningful causation analysis, effectively holding Defendants vicariously liable for the actions of non-agents. That superficial analysis was erroneous, and this Court should reverse it.

### C. The District Court erroneously inferred conspiratorial liability among the Individual Defendants without requiring Plaintiffs to plausibly allege the elements of a § 1983 conspiracy.

Rather than properly analyzing whether each Defendant's actions proximately caused Plaintiffs' alleged injury, the Court essentially held them liable under a theory of co-conspirator liability, indulging Plaintiffs' conclusory argument that they "acted in concert to" violate Plaintiffs' First Amendment rights. [Doc. 26 at 18; *see* Doc. 1 ¶ 34.] But invoking conspiracy theory is not some escape hatch that allows a party to circumvent the pleading requirements of a § 1983 claim. On the contrary, because of the intracorporate conspiracy doctrine, any § 1983 conspiracy claim against Defendants is dead on arrival.

To state a § 1983 conspiracy claim, the plaintiff must allege facts "show[ing] that an agreement between two or more people (at least one of whom is a state actor) to violate his constitutional rights resulted in an actual violation of those rights." *Am. Fed. of Labor and Congress of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1191 (11th Cir. 2011). But "the intracorporate conspiracy doctrine provides that a corporation's employees, acting as agents of the corporation, are unable to conspire among themselves or with the corporation." *Edwards v. Dothan City Schs.*, 82 F.4th 1306, 1312 (11th Cir. 2023). And the doctrine applies with full force to § 1983 claims alleging a conspiracy among the school district officials and their school district to violate a plaintiff's constitutional rights. *Id.* at 1312-13 and n.1.

Because Plaintiffs allege only an intra-CCSD conspiracy to violate their First Amendment rights, the intracorporate conspiracy doctrine guts any § 1983 conspiracy claim. *See id.* The Individual Defendants are all CCSD employees. And Plaintiffs concede that they are suing them over how they performed their discretionary functions as CCSD employees. [Doc. 14 at 14.] Since the Individual Defendants were acting within the scope of their job duties as CCSD officials, they could not conspire among themselves, or with CCSD, to violate Plaintiffs' rights. *See Edwards*, 82 F.4th at 1312.

So by finding that Plaintiffs plausibly alleged that the Individual Defendants "acted in concert" to violate Plaintiffs' rights, the District Court effectively gave

Plaintiffs the benefit of an inference of co-conspirator liability. [Doc. 26 at 18.] And as discussed above, the District Court did so without examining whether Plaintiffs had pled a violation by each Defendant—all based on a conclusory allegation that Defendants "collaborated" together. [*See* Doc. 1 ¶¶ 5-10.] In doing so, the District Court erred, and this Court should reverse.

## II. The District Court erred in denying qualified immunity to the Individual Defendants.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation modified). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation modified). To that end, courts must define the constitutional right at issue with "a high degree of specificity," *D.C. v. Wesby*, 583 U.S. 48, 63 (2018), not "a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017). The right allegedly violated must be "particularized to the facts of the case." *Id*. Unless existing precedent has "placed the statutory or constitutional question beyond debate," qualified immunity protects the public official from suit. *Reichle*, 566 U.S. at 664.

The Eleventh Circuit uses a burden-shifting framework to resolve qualified immunity defenses. *Holloman*, 370 F.3d at 1263-64. To benefit from qualified immunity, the defendant must first show that his alleged misconduct was taken within the scope of his discretionary authority. *Id*. If the defendant carries that initial burden, then the burden shifts to the plaintiff to show that qualified immunity should not apply. *Id*. at 1264.

No one contests whether the Individual Defendants were acting within the scope of their discretionary authority at the time of the alleged conduct. [Docs. 26 at 18; 14 at 14.] Plaintiffs thus have the burden to show that the Individual Defendants are not entitled to qualified immunity. *Holloman*, 370 F.3d at 1264.

That "burden is heavy." *Lenz v. Winburn*, 51 F.3d 1540, 1551 (11th Cir. 1995). At the motion-to-dismiss stage, the plaintiff must first state a claim for a violation of her constitutional rights. *Iqbal*, 556 U.S. at 676. Then she must show that the right at issue was clearly established at the time of the alleged violation. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010). The court may dispose of the case on either ground, in whatever order is most appropriate for the case. *Id.*

A right may be clearly established in three ways in the Eleventh Circuit. *See Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). First, the plaintiff may point to materially indistinguishable precedent holding the defendant's specific conduct to be unlawful. *Id.* at 1208-10. Second, the plaintiff may "point to a broader,

clearly established principle that should control the novel facts of the situation." *Id.* Third, "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Id.*

The latter two methods are what this Court calls the "obvious clarity" exception to the general rule that courts should only deny qualified immunity when armed with materially indistinguishable binding precedent. *See id.* at 1209. Those cases are "exceedingly rare." *Id.*

Where, as here, a plaintiff relies on case law to clearly establish her rights, "officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026). Ordinarily, "a close factual fit between the pre-existing case and the present one is essential." *Cantu v. City of Dothan, Alabama*, 974 F.3d 1217, 1232 (11th Cir. 2020).

The source of the relevant legal principle is critical. Only binding precedent may clearly establish the law. *See Bayse v. Ward*, 147 F.4th 1304, 1313 (11th Cir. 2025). Nonbinding authority—*i.e.*, unpublished cases, sister circuit decisions, district court opinions, and dicta—cannot. *Id.*[4] Because qualified immunity is

[4] In fact, "non-binding persuasive authority can be used to indicate that a particular constitutional right is *not* clearly established." *Corbitt v. Vickers*, 929 F.3d 1304, 1319 n. 14 (11th Cir. 2019) (emphasis added).

"assessed in light of the legal rules that were clearly established at the time the action was taken," *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017), precedent that postdates the conduct in question cannot clearly establish the law. *Brosseau v. Haugen*, 543 U.S. 194, 200 n. 4 (2004).

Finally, courts must consider qualified immunity "on a claim-by-claim and defendant-by-defendant basis." *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1333 (11th Cir. 2025). Because "each defendant is entitled to an individual qualified-immunity analysis as it relates to his or her actions and omissions," *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018), courts may not group defendants together and deny qualified immunity en masse. *See id*. (reversing district court for denying qualified immunity based on defendants' collective conduct rather than parsing each defendant's conduct).

The District Court violated these settled principles. To begin, the District Court failed to identify clearly established law that would have alerted the Individual Defendants that their alleged acts violated Plaintiffs' First Amendment Rights. Instead, it relied on broad principles of First Amendment law that were too generalized to give the Individual Defendants fair warning, and dicta from *Huggins*, which did not exist until two years after the alleged violation. Next, the District Court improperly shifted the burden of overcoming qualified immunity from Plaintiffs to the Individual Defendants. And building on those other errors, the District Court

denied qualified immunity in gross, depriving the Individual Defendants of the individualized qualified immunity analysis each was entitled to.

### A. The District Court identified no legal authority clearly establishing the unconstitutionality of the Individual Defendants' actions.

In finding that the unconstitutionality of the Individual Defendants' alleged acts was "clearly established" at the time of the Board meeting, the District Court erred in three critical ways. First, the District Court's formulation of "clearly established law" was too generalized and abstract to have given the Individual Defendants fair warning that their alleged acts violated Plaintiff's First Amendment rights. Second, the District Court also erred in finding that a broad proposition from *Holloman* established with "obvious clarity" the unlawfulness of the Individual Defendants' alleged acts here [*see* Doc. 26 at 19]; quite simply, that case is so wildly dissimilar that it could not have reasonably put the Individual Defendants on notice that their alleged acts violated Plaintiffs' First Amendment rights here. Third, in relying on dicta from *Huggins*, the District Court erroneously held the Individual Defendants to a legal standard that did not yet exist. [Doc. 26 at 20-21.]

#### i. The District Court defined "clearly established law" at a too-high level of generality.

Recall the oft-repeated command that lower courts must define the constitutional right at issue with "a high degree of specificity," *Wesby*, 583 U.S. a 63, not "a high level of generality." *Pauly*, 580 U.S. at 79. Ignoring this principle,

the District Court held that "a person's right to be free from viewpoint discrimination, ***in general***, is clearly established." [Doc. 26 at 20] (emphasis added). The District Court's admittedly abstract formulation of law contradicts the Supreme Court's clear instructions.

Three First Amendment precedents illustrate the District Court's error. Begin with *Reichle*, *supra*. There, the plaintiff alleged that his First Amendment rights were violated when he was arrested in retaliation for exercising his right to free speech. 566 U.S. at 660. But the defendant had probable cause to believe the plaintiff had committed a crime thus authorizing the arrest. *Id*. Rather than relying on general First Amendment principles, the Court particularized the clearly established law question to the facts of the case. The Court explained: "the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause." *Id*. at 665 (emphasis added). Because the Supreme Court "ha[d] never held that there is such a right," the law was not clearly established for qualified immunity purposes. *Id*.

Next, consider *Wood v. Moss*. 572 U.S. 744 (2014). There, two groups of demonstrators with opposing viewpoints hoped to see President Bush's motorcade as it passed by. *Id*. at 753. The defendant secret service agents created a security perimeter around the President and moved the anti-Bush demonstrators to a less

desirable location. *Id.* at 754. The plaintiffs alleged that the secret service's conduct amounted to viewpoint discrimination under the First Amendment. *Id.* The Court recognized the general principle that the First Amendment prohibits viewpoint-based discrimination. *Id.* at 748. But it did not define clearly established rights in general anti-viewpoint-discrimination terms. Rather, it particularized the question to the specific facts of the case, asking whether it was clearly established that defendants "bore a First Amendment obligation to ensure that groups with different viewpoints are at comparable locations at all times" such that a reasonable official would have known "that the security perimeter they established violated the First Amendment?" *Id.* at 757-760. Because no prior decision had provided a clear answer, the defendants were entitled to qualified immunity. *Id.* at 759.

End with *Lane v. Franks*, decided shortly after *Moss*. 573 U.S. 228 (2014). The plaintiff alleged that he was terminated in retaliation for testifying as a witness at a criminal trial in violation of the First Amendment. *Id.* at 241. The Court held the plaintiff's testimony was "entitled to protection under the First Amendment" and thus stated a claim for retaliation. *Id.* at 242. But the Court then considered the defendant's entitlement to qualified immunity. The Court did not rely on general First Amendment law but particularized the clearly established law inquiry to the specific facts of the case: "The relevant question for qualified immunity purposes is this: Could Franks reasonably have believed, at the time he fired Lane, that a

government employer could fire an employee on account of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities?" *Id.* at 243. Because "no decision of this Court" clearly answered the question, qualified immunity applied. *Id.*

In each case, the Supreme Court rejected a general formulation of First Amendment law and instead particularized the right at issue to the facts of the case. This Court should follow *Reichle*, *Moss*, and *Lane*, and particularize clearly established law to our facts.

Plaintiffs allege they suffered a First Amendment violation when the signup tablet was moved from inside the lobby to outside the building causing the Plaintiffs to lose their place in line and thus depriving them of the opportunity to speak at public comment. Defined at the appropriate level of specificity, the appropriate inquiry must begin with whether the Plaintiffs had a clearly established right to maintain their place in line to sign up for public comment such that every reasonable official would have known that delivering the device outside violated the First Amendment in the circumstances the Individual Defendants faced. *See Moss* at 757-760 ("Should it have been clear to the agents that the security perimeter they established violated the First Amendment?").

Neither the Supreme Court nor this Court has ever recognized such a right. And because the right at issue is not clearly established under existing law, an official

in the Individual Defendants' position would not have known their conduct was unreasonable in light of the surrounding circumstances. Plaintiffs and their associates crowded the Board's lobby area after holding demonstrations outside. [Doc. 1 ¶¶ 28-29.] In light of these circumstances, an official could conclude that delivering the sign-up tablet outside was reasonable because it would have facilitated better crowd control. The chaos and shoving that ensued confirms the point, as controlling that behavior would have been more difficult in a confined space. Under existing law, few (if any) public officials would have believed that doing so would violate the First Amendment.

**ii. The District Court erroneously found that *Holloman* "obviously" established the unconstitutionality of the Individual Defendants' alleged acts.**

The District Court erroneously found that *Holloman* established with "obvious clarity" that each Individual Defendant's alleged acts violated Plaintiffs' First Amendment rights. [*See* Doc. 26 at 19.] Obvious clarity cases only "exist where the words of the federal statute or constitutional provision at issue are 'so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful,' or where the case law that does exist is so clear and broad (and 'not tied to particularized facts') that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Gaines*, 871 F.3d at 1209 (quoting *Vinyard v. Wilson*,

311 F.3d 1340, 1350–51 (11th Cir. 2002)). But nothing about *Holloman* would have alerted the Individual Defendants that their alleged acts here amounted to impermissible viewpoint discrimination.

In *Holloman*, school officials disciplined a student for refusing to participate in the daily flag salute despite the fact that the Supreme Court had held that school officials violate the constitution by compelling flag salutes. 370 F.3d at 1269 (citing *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Because *Barnette* clearly established the right of a student to refuse to salute the flag, *Holloman* denied qualified immunity. *Id.* at 1269. In light of the obvious factual differences between (a) a student who refused to salute the flag at school in *Holloman*, and (b) a grown adult who lost her place in line to sign up for public comment at a local school board meeting, a reasonable official could have read *Holloman* and not known for certain that it proscribed each Individual Defendant's specific conduct. *See Zorn*, 146 S. Ct. at 930 (qualified immunity applies unless the defendant "could have read the relevant precedent beforehand and known that it proscribed their specific conduct.").

In sum, *Holloman* is so factually dissimilar to prevent it from clearly establishing the law in our case—especially not with obvious clarity as the District Court found. [*See* Doc. 26 at 19.] As this Court has recognized, "it is particularly difficult to overcome the qualified immunity defense in the First Amendment

context." *Gaines*, 871 F.3d at 1210. The District Court did not meet that difficult standard by pointing to an old First Amendment case that bore no similarity to the alleged facts here.

#### iii. In relying on *Huggins*, the District Court erroneously defined "clearly established law" based on footnoted dictum from post-dated precedent.

Armed with no dispositive, pre-violation legal authority, the District Court compounded its error by relying on dictum from *Huggins*, a 2025 case. [Doc. 26 at 20-21.] Recall that courts may not rely on precedent issued after the conduct in question to deny qualified immunity. *See Brosseau*, 543 U.S. at 200, n. 4. Nor may courts rely on dictum to clearly establish the law, let alone "footnoted dictum." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011). In relying on *Huggins*, the District Court violated both principles in one fell swoop.

To begin, *Huggins* was not decided until well after the Individual Defendants' alleged misconduct. So *Huggins* could not have clearly established the law in September 2023. *See Brosseau*, 543 U.S. at 200 n. 4 (explaining that post hoc precedent is categorically irrelevant to the clearly established law inquiry); *al-Kidd*, 563 U.S. at 731 (explaining that footnoted dictum cannot clearly establish the law

for qualified immunity purposes). For that reason alone, the District Court's reliance on *Huggins* was erroneous.[5]

Putting aside that anachronistic error, *Huggins* also cannot carry the day because the District Court relied on its dicta. Citing *Huggins's* footnote 7, the District Court concluded that the Individual Defendants had notice that their viewpoint-discrimination-motivated conduct was unconstitutional." [Doc. 26 at 21.] But footnote 7 is non-binding dicta. The *Huggins* court had already denied qualified immunity because the conduct in question fell outside scope of the defendant's discretionary authority, so the issue was unnecessary to the case. *See United States v. Eggersdorf*, 126 F.3d 1318, 1322 n. 4 (11th Cir. 1997) (explaining that language is dicta if it is "not necessary to deciding the case then before" the court). Indeed, footnote 7 begins with the qualifier "Even if," which is a telltale sign of dicta. *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("All statements that go beyond the facts of the case—and sometimes, but not always, they begin with the

---

[5] Perhaps recognizing the error of relying on dicta from a case that post-dated the Board meeting by two years, the District Court tried to cover its tracks by also emphasizing that the *Huggins* court relied on *Holloman*. [Doc. 26 at 20 ("Citing Holloman, the Eleventh Circuit recently reiterated this principle in Huggins, 151 F.4th at 1279 n.7.").] In other words, the District Court hoped to use a 2004 case (*Holloman*) to justify its reliance on a post-violation case (*Huggins*). But those ill-conceived "rescue efforts" fall short because, as discussed above, *Holloman* did not come close to clearly establishing the law. *See Pina v. Est. of Dominguez*, 145 S. Ct. 527, 528 (2025) (Alito, J., and Thomas, J., dissenting from denial of certiorari).

word 'if'—are dicta."). In other words, the denial of qualified immunity turned on an issue (the lack of a discretionary function) that is not present here, given the parties' agreement that Plaintiffs sue the Individual Defendants over how they performed their discretionary functions. [Doc. 26 at 18.] So even if *Huggins* might aid in how this Court analyzes viewpoint discrimination cases *now*, it says nothing about what the state of the law was on September 14, 2023.

### B. The District Court improperly shifted the burden of showing a clearly established constitutional violation from Plaintiffs to the Individual Defendants.

Because Plaintiffs agree that they sue the Individual Defendants over how they were performing discretionary functions, the Individual Defendants carried their initial burden of showing general entitlement to qualified immunity. *Holloman*, 370 F.3d at 1263-64. The burden therefore shifted to Plaintiffs to show that each Individual Defendant deserved no qualified immunity. *Id.* at 1264. That burden required Plaintiff not only to identify factual allegations plausibly showing that each Individual Defendant, "through the official's own individual actions," violated their First Amendment rights, *Iqbal*, 556 U.S. at 676, but also point to controlling legal authority "clearly establishing" the unconstitutionality of those alleged acts. *Brown*, 608 F.3d at 734.

Rather than shifting that burden to Plaintiffs, the District Court improperly pushed it back onto the Individual Defendants:

> Although the section that Defendants reference contains argument on Plaintiffs' failure to allege a constitutional violation, it does not focus on the conduct of any Individual Defendant but rather on Policy BCBI. . . . Thus, Defendants' argument does not move the needle.

[Doc. 26 at 18-19.] But it was Plaintiffs' job—not the Individual Defendants'—to "move the needle." *Holloman*, 370 F.3d at 1264. In explicitly requiring the Individual Defendants, rather than Plaintiffs, to focus on allegations relating to each Individual Defendant's conduct, the District Court got it wrong.

That burden-shifting error is especially problematic in a 12(b)(6) motion, where the Court must confine its analysis to the four corners of the complaint. At the pleading stage, the Individual Defendants cannot simply provide record evidence that the complaint's allegations are false; nor can they fill in all the factual gaps riddled throughout Plaintiffs' pleadings. Where plaintiffs have named government officials as defendants, without specifically alleging what they contend each one did that was unconstitutional, the government official would be in the impossible position of having to prove a negative.

In moving to dismiss on qualified immunity grounds, the defendants should be able to argue that, given the dearth of factual allegations, the plaintiffs have not plausibly alleged a constitutional violation by each defendant. The plaintiff may then try to refute that argument by pointing out specific factual allegations in the complaint showing otherwise. *Iqbal*, 556 U.S. at 676. But if the Court (as here) lets the plaintiffs off the hook, then it effectively allows the plaintiff to litigate through

obfuscation. That is what happened here. Plaintiffs conducted no individualized qualified immunity analysis. And as discussed below, the District Court did not do that work for them. As a result, the District Court deprived each Individual Defendant of the individualized qualified immunity analysis he/she was entitled to.

### C. The District Court wrongly denied qualified immunity en masse.

Though the District Court relied on *Huggins* to deny the Individual Defendants' qualified immunity, the District Court took away the wrong lesson from that case. In *Huggins*, this Court reiterated that each defendant is entitled to an independent qualified-immunity analysis concerning his/her specific actions or omissions. *Huggins*, 151 F.4th at 1284. And that is what this Court did, examining the plaintiff's factual allegations against both (i) the superintendent who allegedly gave the unconstitutional order and (ii) the two government official who allegedly followed the unconstitutional order. *Id.* at 1278, 1283-84. This Court held that the superintendent could not even meet her initial burden of showing entitlement to qualified immunity, given that she lacked legal authority to issue the removal order in the first place, whether or not it was viewpoint-driven. *Id.* at 1278. And this Court enforced the qualified immunity of the security chief and police officer who followed the order, even though they were the ones who physically removed the plaintiff from the board meeting. *Id.* at 1283-84. That is how the qualified immunity analysis is supposed to work.

The District Court did not do that here. Rather than examining whether each Individual Defendant's alleged acts violated clearly established law, the District Court latched onto a threadbare allegation that they all "collaborated" to "manipulate" the sign-up process [*id.* ¶¶ 5-10] and denied qualified immunity in gross. [Doc. 26 at 18-19.] Surely a school district official deserves more consideration than that.

As discussed in Section I above, Plaintiffs have not plausibly alleged that any Individual Defendant violated their First Amendment rights, had a viewpoint-driven motive, personally prevented Plaintiffs from getting the sign-up line, deputized any counter-protesters to remove Plaintiffs from the sign-up line, or conspired with anybody to prevent Plaintiffs from speaking. And even if this Court assumed that some of the Individual Defendants' actions were unconstitutional, the unlawfulness of those alleged acts certainly was not clearly established in September 2023.

The District Court therefore erred in denying the Individual Defendants of their qualified immunity. This Court should reverse.

## CONCLUSION

For the above reasons, Defendants ask this Court to reverse the District Court's order on Defendants' Joint Motion to Dismiss [Doc. 26], hold that Plaintiffs have not plausibly alleged a violation of their First Amendment rights by either the Individual Defendants or CCSD, enforce the Individual Defendants' qualified immunity, and remand with instructions to dismiss the action under Rule 12(b)(6).

Respectfully submitted this 15th day of July, 2026.

*/s/ Jeffrey R. Daniel*
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Appellants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30309
678.690.5750
404.869.6972 (facsimile)
jeffdaniel@parkerpoe.com

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Rules of the United States Court of Appeals for the Eleventh Circuit, the undersigned counsel for the Appellants hereby certifies that this principal brief complies with the type-volume limitation of the Rules concerning the number of words (13,000) in a brief. Appellants certify that the number of words in this Brief is 12,561 excluding the parts of the brief exempted by Rule 32(a)(7)(b)(iii) and Eleventh Circuit Rule 32-4. Appellants certify that the number of words in this Brief was calculated by the word processing program Microsoft Word.

The brief complies with the typeface requirements and was prepared with Microsoft Word, Times New Roman, 14 point type.

Respectfully submitted this 15th day of July, 2026.

*/s/ Jeffrey R. Daniel*
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Appellants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30309
678.690.5750
404.869.6972 (facsimile)
jeffdaniel@parkerpoe.com